UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| L.L. Bean, Inc., <br> Plaintiff/Defendant-in-counterclaim <br><br><br><br> v. <br><br> Bank of America Corporation and FIA Card Services, N.A., <br>          Defendants/Plaintiffs-in-counterclaim | ) <br> ) <br> ) <br> ) <br> ) <br> )   CIVIL ACTION NO. <br> ) <br> )      08-177-PH <br> ) <br> ) <br> ) |

| | |
|---|---|
| FIA Card Services, N.A., <br>          Plaintiff-in-counterclaim <br><br> v. <br><br> L.L. Bean, Inc., <br>          Defendant-in-counterclaim | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL
DEFENDANTS TO REVIEW AND PRODUCE DOCUMENTS AND FOR PROTECTIVE
ORDER AS TO THIRD-PARTY SUBPOENAS AND
DEFENDANTS' MOTION FOR PROTECTIVE ORDER WITH INCORPORATED
MEMORANDUM OF LAW**

McGuireWoods LLP
Bradley R. Kutrow
Grant D. Goldenberg
Angela H. Zimmern
100 North Tryon St, Suite 2900
Charlotte, NC 28202
(704) 343-2000
bkutrow@mcguirewoods.com
ggoldenberg@mcguirewoods.com
azimmern@mcguirewoods.com

*Attorneys for Bank of America Corp and
FIA Card Services, Inc.*

## **INTRODUCTION**

Defendants Bank of America Corporation ("BAC") and FIA Card Services, N.A. ("FIA") (together, "Defendants") respectfully submit this memorandum in opposition to Plaintiff L.L. Bean, Inc.'s ("Plaintiff" or "Bean") Motion to Compel Defendants to Review and Produce Documents and for Protective Order as to Third-Party Subpoenas, and as Defendants' Motion for Protective Order under Rule 26(c) to protect them from needless and unduly burdensome production of duplicative electronically-stored information ("ESI").

Bean seeks in a single filing to force Defendants to engage in unneeded and duplicative review of ESI at considerable expense, while at the same time seeking to delay and obstruct Defendants' ongoing efforts to obtain concededly relevant documents from non-parties. Bean is undeterred by the inconsistency of its filing and unwilling to consider any fact it finds inconvenient. The discovery rules mandate, however, a balanced approach that weighs the parties' needs for information in view of cost, the amount in controversy, and practical concerns, including the limited time remaining for discovery. Bean's filing – with its inappropriately militant accusations of "carpet bombing," a "scorched earth" "campaign," and attacks on Defendants' good faith – does not take that approach.

Defendants crafted a detailed plan early in this litigation for the production of ESI. They shared this plan with counsel for Bean, which refused to cooperate in the formulation of **any** plan for discovery of ESI. Following this plan, Defendants have already produced hundreds of thousands of pages of documents from 21 custodians, 27 shared network folders, and four additional network folders (plus 128 boxes of hard copy documents from multiple custodians). Meanwhile, Bean's own documents have been produced haltingly and in a fundamentally deficient format that casts serious doubt on the integrity of its collection and production process.

1

Nevertheless, Bean now seeks to force Defendants to collect, review (and potentially produce) **every** possibly source of ESI from **any** employee – literally hundreds of thousands of additional pages of ESI – even if whatever responsive documents might be contained in this additional ESI duplicate those already produced. Even as Bean demands that BAC and FIA undertake unduly burdensome and duplicative electronic discovery, it urges this Court to assume jurisdiction to block non-party discovery that is ongoing in other districts, and indeed has been ongoing for months. In both respects, Bean is not entitled to the extraordinary relief it seeks.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Underlying Claims

This lawsuit arises from the termination of FIA's co-branded credit card relationship with Plaintiff. During that contractual relationship, which lasted from 1996 until 2008, FIA issued and marketed a co-branded L.L. Bean Visa Card.

In 2007, nearing the end of its contract with FIA, Bean initiated a competitive Request for Proposal process. It hired its longtime consultant Auriemma Consulting Group to solicit proposals from potential card issuers. FIA submitted a proposal, as did Barclays Bank Delaware ("Barclays"), which Bean chose as its new credit card partner. (Other banks presumably submitted RFP responses, but Bean has refused to produce them.) Bean notified Defendants of its decision and signed a contract with Barclays in September 2007, nine months before the FIA/Bean contract expired. FIA was required to convert its customers' Bean Visa cards to another card program (the "Conversion"). FIA established a team of employees responsible for the Conversion, which worked from late 2007 through the end of the FIA/Bean contract. During this same period, Bean and Barclays designed and marketed a Visa card to compete with the card issued by FIA. Both before and after termination, Bean and Barclays attempted to solicit away FIA's more than two million cardholders, while FIA sought to retain its cardholders' business.

2

The performance of Barclays' card is now a basis for Bean's damages claims. Thus, several categories of documents are relevant to the parties' claims: (1) documents relating to the negotiation and drafting of the FIA-Bean co-branded credit card agreements in 1996 and its subsequent revisions; (2) documents relating to Bean's search for a new credit card partner and reasons for its decision to terminate its relationship with FIA; (3) Conversion documents, and (4) documents relating to post-Conversion performance of the competing credit cards.

**B.**      **Defendants' Discovery Plan and Efforts to Reach Agreement with Plaintiff**

From the outset of this case, Defendants recognized that a substantial portion of the relevant documents were stored electronically and sought to reach an agreement with Bean as to how discovery of ESI would be handled.  On September 26, 2008, counsel for the parties held a conference pursuant to Fed. R. Civ. P. 26(f).  In advance of the conference, counsel for Defendants identified to Plaintiff's counsel a number of discovery issues that needed to be addressed.  Sept. 25, 2008 Email from Bradley Kutrow to George Isaacson, attached as Ex. 1.  During the conference and in follow-up correspondence, Defendants proposed that the parties agree on methods of electronic discovery and production format.

On October 2, Defense counsel wrote Bean counsel describing Defendants' collection methods and asking for similar information from Bean.  Counsel suggested that the parties cooperate in managing electronic discovery by identifying key document custodians and employing search term filtering.  Oct. 2, 2008 Ltr. from Grant Goldenberg to Matthew Schaefer, attached as Ex. 2.  Initially, prospects for the cooperation seemed good.  Bean agreed to provide a list of custodians, *see* Oct. 3, 2008 Ltr. from Isaacson to Elaine McChesney, attached as Ex. 3, and the parties agreed to the terms of a Stipulated Confidentiality Order entered Oct. 23, 2008.  But Bean's counsel was willing only to discuss issues in managing ESI discovery "as they arise," and never prepared a Bean custodian list.

3

On November 24, Defendants counsel again wrote Bean counsel describing in detail the approach Defendants planned to take to ESI discovery (the "E-discovery Plan"), including a list of the primary document custodians (backed up by the applicable organization charts), what sources of ESI would be collected and reviewed, and search terms to be used.  Nov. 24, 2008 Ltr. from Goldenberg to Schaefer, attached as Ex. 5.  Defendants' letter explained that counsel, through client interviews, had identified 19 Primary Custodians who possessed ESI relevant to the parties' claims and counterclaims.  It also explained that "to the extent other individuals may possess ESI responsive to Bean's discovery requests, these individuals would have provided support to the Primary Custodians."  Accordingly, Defendants advised Bean that ESI held by such supporting individuals ("Secondary Custodians") would be duplicative of that maintained by the Primary Custodians, and that the marginal benefit of reviewing and producing data from Secondary Custodians' files would not outweigh the associated burden and cost.

Bean never objected to the search terms developed by Defendants' counsel to retrieve the Primary Custodians' potentially-responsive ESI, nor did it suggest additional search terms.[1]  Nor did Bean's counsel propose any alternative method to manage discovery of voluminous ESI.

In addition to individual Primary Custodians' data, Defendants told Bean that they had collected 34 gigabytes of data from dedicated network folders that were used by various employees to save ESI regarding FIA's relationship with Plaintiff in a central location.[2]  To the extent that these shared folders contained only documents relating to Bean, Defendants did not apply search terms and instead reviewed the entire contents of the folders for production to

---

[1] In the Nov. 24 letter, Defendants explained that they had already collected ESI from each Primary Custodian's active Microsoft Outlook inbox, subfolders, sent items folder, and deleted items folder, local hard drives and each custodian's individually-allotted server space for saving and accessing electronic files.  This ESI comprised 179 gigabytes of data.  Ex. 4 at 1-2.  To narrow this enormous amount of data, Defendants developed and provided to Bean's counsel a very broad list of search terms designed to reduce the ESI to a manageable volume.  *Id.* at 2.

[2] A list of the names of shared folders collected by Defendants is attached as Ex. 16.

Plaintiff. *Id.* at 2. Defendants' counsel also advised Bean they had collected 120 boxes of hard copy documents that they were reviewing for responsiveness. *Id.*

**C.     Plaintiff's Failure to Cooperate Regarding the Discovery of ESI**

Although Defendants shared details of their e-discovery Plan with Bean, Bean refused to reciprocate. Starting with the parties' Rule 26(f) Conference, Defendants have repeatedly asked Bean to provide (1) information about the sources Bean is searching for responsive ESI, (2) the methods used to search these sources, (3) and a description of any documents that Bean considers to be too burdensome to review. Bean has declined to provide this information.

Instead of describing their plan for ESI discovery, Plaintiff told Defendants that Bean had data on tapes that Bean would not review because it was deemed not "readily accessible" and if Defendants wanted data on the tapes they would have to pay $55,000 to $77,000 to retrieve it. *See* Ex. 4, Nov. 7, 2008 email from Schaefer to Goldenberg. Of course, as defense counsel pointed out, Defendants could not assess the need for such data without any information about Bean's document destruction practices or the volume, sources, and comprehensiveness (or lack thereof) of Bean's production of "readily accessible" ESI. Nov. 18, 2008, email from Goldenberg to Schaefer, attached as Ex. 4. Only yesterday, April 6, 2009, Bean disclosed that it had decided to review and produce documents from these tapes.

While Bean has objected generally to Defendants' E-discovery Plan, it has offered no alternative. Indeed, it appears Bean has no plan. Bean's counsel has written early on: "[i]n my view, we should proceed with discovery and confront issues associated with the potential burdens of identifying and reviewing electronically stored information as they arise." Ex. 3.

**D.     Bean's Own Document Production is Substantially Deficient.**

Bean's document production to date reveals substantial problems in its collection and production methods. Bean had not produced any ESI associated with specific custodians until

very recently, and has produced limited financial information.  Mar. 16, 2009 Ltr. from Kutrow to

Isaacson and Schaefer, attached as Ex. 9.  Although it has not yet produced the documents most

relevant to the claims and defenses in this action, Bean has produced 154,276 pages of "records

of customer online chat," 31,000 pages from catalogs, and 41,000 pages of other customer

service records or marketing material.  *Id.*  These documents inflate Bean's page count but shed

little light on the core liability and damages issues.

Moreover, Bean's production raises serious questions about how and when its documents

were collected and saved to its preferred .pdf format.  Jan. 15, 2009 Ltr. From Goldenberg to

Schaefer, attached as Ex. 6.  Defendants are unsure how long ago this process occurred.[3]  Bean

employees evidently copied and pasted part, but not all, of the text from emails into Microsoft

Word documents and Excel spreadsheets and saved them to a "legal" folder on a shared drive.

*Id.* at 2-3.[4]  In multiple phone calls and letters, defense counsel pointed out the problems with

Bean's first production and sought assurances that these problems would be corrected.  These

exchanges are ongoing.  *See* Apr. 6, 2009 Ltr. from Goldenberg to Schaefer, attached as Ex. 12;

Apr. 7, 2009 Ltr. From Schaefer to Goldenberg, Ex. 13**.**  Bean's choices of collection methods

and production format are highly unconventional and are making extra work for Defendants.

**E.      Bean's Meritless Objections to Defendants' E-discovery Plan**

Several hours after receiving defense counsel's  January 15 letter cataloguing Bean's

numerous production deficiencies, Bean's counsel emailed a letter complaining about

Defendants' Primary Custodian method of managing ESI discovery and demanding that

---

[3] Bean's Rule 26 Initial Disclosures, served Sept. 23, 2008, indicated that all documents identified as discoverable therein were then located at the offices of Bean's counsel.
[4] Defendants' counsel also pointed out Bean's other production deficiencies, including failure to provide document breaks, combining multiple documents into 1000-page .pdf files (in many cases, with multiple documents or parts thereof appearing on the same page), failing to keep emails and their attachments together, and certain copying and pasting practices that cast doubt on the integrity of Bean's document production.  Ex. 6 at 2-4.

Defendants review and produce ESI from 16 individuals who were not on the Primary Custodian list. Jan. 15, 2009 Ltr. from Schaefer to Goldenberg, attached as Ex. 7.

Bean based its demand for review and production of these 16 individuals' ESI on a single email – sent by a Primary Custodian and copied to a Primary Custodian – dated August 1, 2008 (well after the Conversion and after Bean's lawsuit), which distributed a Performance Summary Report about the FIA customers for whose business Bean and FIA were competing. Moreover, Bean misquoted the email as saying the individual recipients were playing "important roles" in FIA's efforts – when it actually says the recipients' "teams are playing" important roles. *See* Aug. 1, 2008 Email from Carlos Viera to Leslie Gillen and others, attached as Ex. 14.

Defendants' counsel responded February 11, advising Bean that they were assessing its request for a production from additional custodians and saying "[i]f we discover that a Secondary Custodian should be elevated to a Primary Custodian status, we will produce that individual's non-privileged, responsive documents. Currently, we anticipate that the Primary Custodian list will be expanded." Feb. 11, 2009 Ltr. from Goldenberg to Schaefer, attached as Ex. 8.[5]

Defendants then prepared and conducted a survey of the individuals Bean identified in its January 15 letter concerning their roles and/or work, if any, in connection with Bean. Survey Form, attached as Ex. 15.[6] Defendants specifically asked each of these individuals if he or she possessed unique documents that were not created by, sent from, sent to, or copied to at least one of the Primary Custodians or saved to one of the shared folders associated with Bean or a Primary Custodian. Each of these additional custodians indicated when surveyed that their ESI would be duplicative of the Primary Custodians' ESI.

---

[5] Philip Floor was added as a Primary Custodian. He was a also a recipient of the Aug. 1, 2008 Carlos Viera email.
[6] A copy of the Survey Form distributed to these employees is attached as Ex. 15. Defendants are moving to submit copies of the completed surveys to the Court *in camera* and proffering them for review if the Court wishes to examine them. Defendants do not waive the attorney-client privilege and work product doctrine protection afforded these communications between FIA's employees and their counsel.

To date, Defendants have expanded the Primary Custodian list to include 21 custodians (including Floor, one of the employees Bean identified), and have made six productions comprising more than 230,000 pages of documents obtained from the 21 Primary Custodians, 27 different network shared folders dedicated to Bean, four more shared folders associated with a Primary Custodian, and hard copy files.  *See* Apr. 2, 2009 Ltr. from Goldenberg to Schaefer, attached as Ex. 10.

## F.     Defendants' Efforts to Obtain Relevant Documents from Non-Parties.

While seeking document discovery from Bean, Defendants promptly began serving Rule 45 document subpoenas on non-parties who advised Bean about credit card issues or assisted it in launching the competitive Barclays co-branded card:

- Barclays (on Oct. 23, 2008)[7];

- Auriemma Consulting Group, Inc. ("Auriemma"), a credit card consulting firm which advised Bean on its FIA contract negotiations beginning in 1996 and conducted the RFP process for Bean  (on Nov. 25, 2008);

- Acxciom Corp. ("Acxiom"), Bean's data processing firm, which managed its customer and credit card-related data (on Dec. 3, 2008); and

- Resource Systems Group ("RSG"), a firm that conducted multiple market surveys and studies for Bean, most notably in the spring of 2008 (on Feb. 18, 2009).

Acxiom has already completed its production.  Barclays is producing documents following a motion to compel that Defendants filed in the District of Delaware, which remains pending.  Aureimma, after the filing of a motion to compel in the Eastern District of New York, has pledged that it will produce some documents while withholding others based on Bean's objections and instructions.  Counsel for RSG has served written objections and in discussions

---

[7] Like Defendants, Barclays is taking a "primary custodian" approach to ESI. Barclays identified 17 primary custodians and has collected roughly 80,000 relevant documents.

with Movants' counsel has indicated it will produce documents except where Bean has instructed RSG not to based on Bean's contractual rights.  Apr. 3, 2008 Ltr. From Geoffrey Vitt to Kutrow, attached as Ex. 11.  Those discussions are ongoing.

All of these non-parties are represented by counsel, with whom Defendants have consistently sought to cooperate with varying levels of success.  Defendants' subpoenas to each of these non-parties, while comprehensive, seek no more than what Defendants need considering the claims, defenses and alleged damages in this $100 million suit.  Moreover, because each non-party had a different relationship with Bean, they should not have the same documents.

## ARGUMENT

**A.    Bean's Demand for Review and Production of Duplicative ESI Should be Denied.**

Fed. R. Civ. P. 26(b)(2)(C) provides that "the court must limit the frequency or extent of discovery otherwise allowed by these rules" if it finds that "the discovery sought is unreasonably cumulative or duplicative," the party seeking discovery has had "ample opportunity" to obtain the information, or if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."   In assessing whether the costs and burdens involved in the production of ESI outweigh the information's potential value, the Court should consider:

> (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) whether the responding party has failed to preserve information in accessible sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

Fed. R. Civ. P. 26(b)(2)(C), 2006 Committee Note; *Quinby v. WestLB AG*, 245 F.R.D. 94, 102 (S.D.N.Y. 2006).

Here, Bean seeks nonspecified additional discovery of "all relevant documents," even though Defendants have made a comprehensive document production according to the plan the counsel outlined at the beginning of this action.  The discovery Bean seeks is cumulative and duplicative of what Defendants have already produced, and any marginal benefit to Bean is outweighed by the cost and burden it would impose on Defendants at this stage of the case.

Moreover, Bean has not identified any specific deficiency or void in Defendants' production.  Put another way, Bean has not said that any request for documents has not elicited a production of responsive documents, or described documents it requested but does not have.

### 1.   Defendants Are Not Required to Review and Produce Additional ESI From Sources Other than the 21 Primary Custodians, 31 Shared Folders, and Hard Copy Files.

The Federal Rules recognize that given the sheer volume of ESI generated by parties to litigation, it is exceedingly difficult and prohibitively expensive for parties to search or produce every piece of ESI that might potentially be relevant to a lawsuit:

> It is neither reasonable nor feasible for a party to search or produce information from every electronic file that might potentially contain information relevant to every issue in the litigation, nor is a party required to do so. It should be reasonable, for example, to limit searches for email messages to the accounts of key witnesses in the litigation, for the same reasons that it has been regarded as reasonable to limit searches for paper documents to the files of key individuals. Likewise, it should be appropriate, absent unusual circumstances, to limit review for production to those sources most likely to contain nonduplicative relevant information (such as active files or removable media used by key employees). The use of search terms may assist in reducing the volume of information that must be further reviewed for relevance and privilege.

The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production (2d ed. 2007), at 26.  Courts have endorsed the approach advocated by the Sedona Conference to managing ESI discovery and promoting all parties' obligation to cooperate in discovery in order to facilitate adjudication of the merits.  *See, e.g., Mancia v. Mayflower Textile Servs. Co.*, --- F. Supp. 2d ---, 2008 WL 4595175 at *8-9 (D. Md. Oct. 15, 2008).

Consistent with these principles, courts have recognized that it is appropriate to limit searches to specified custodians known to have responsive information and to use search terms.  *See, e.g.*, *Quinby*, 245 F.R.D. at 99 (court limited plaintiff's document requests to searches of 17 custodians and between 3 and 15 search terms); *Flexsys Americas LP v. Kumho Tire U.S.A., Inc.*, 2006 WL 3526794 at *3 (N.D. Ohio Dec. 6, 2006) (limiting discovery of ESI to10 employees).

From the outset, Defendants' counsel have sought to cooperate with Bean's counsel regarding ESI discovery and have been transparent about their plan to manage the associated burden and cost by producing documents maintained by the key FIA employees who worked on the Conversion while "limit[ing] review for production to those sources most likely to contain nonduplicative relevant information."  Even before formal discovery requests from Bean, Defendants provided a list of Primary Custodians and relevant organization charts for the Bean account.  They also identified sources from which ESI was collected, provided a lengthy search terms list, and sought to agree with Bean on protocols for discovery of that information.

Bean, conversely, has consistently refused to identify its sources or method of ESI collection, describe its systems, or to agree to **any** plan for the discovery of ESI, instead insisting that the parties "confront issues associated with the potential burdens of identifying and reviewing electronically stored information as they arise." Ex. 3.  Bean has allowed Defendants' review and production to proceed for months without seeking to resolve the issues it now raises by motion.

Bean now insists that Defendants "review all admittedly relevant documents and produce such materials as fall within the scope of the discovery requests."  Bean Mot. to Compel at 10. But Defendants are not required under the rules to "review all relevant documents" regardless of burden and expense.  Discovery may be limited if the documents sought will be duplicative or cumulative, the discovering party has already had ample opportunity to obtain the information,

and if "the burden or expense of the proposed discovery outweighs its likely benefit..." Rule 26(b)(2)(C) (i-iii). In addition, Fed. R. Civ. P. 26(b)(2)(B) provides that "[a] party need not provide discovery of electronically stored information that the party identifies as not reasonably accessible because of undue burden or cost."

### a. Review of All Potentially Relevant Documents Would Be Unreasonably Duplicative, Unduly Burdensome, and Costly.

As Defendants have repeatedly explained to Bean, Bean's lengthy Second Amended Complaint, its 142 document requests, and FIA's size and organizational structure necessarily implicate hundreds of individuals in numerous departments. Ex. 8. FIA created a primary team responsible for the Conversion of FIA's credit card accounts from the L.L. Bean co-branded credit card to an FIA card, as contemplated by the agreement governing the parties' relationship. *Id.* This team became the repository of FIA's collective knowledge about the matters in dispute. The ESI in the custody of the Primary Custodians – together with the contents of the dedicated Bean shared folders used by team members – comprises substantially all of the responsive ESI in Defendants' possession. *Id.* To the extent Secondary Custodians may possess documents responsive to Bean's discovery requests, those individuals provided support to and communicated with Primary Custodians in the ordinary course of carrying out their specific tasks and responsibilities. Thus, the ESI contained in the Secondary Custodians' electronic files is cumulative and duplicative of information in the Primary Custodians' files or of limited materiality to the lawsuit. *Id.*[8]

---

[8] Although Bean suggests in its motion that the Primary Custodians are "top managers" who would not be "burdened with the documentation generated by their supporting personnel" Bean Mot. to Compel at 9, the organization charts that Defendants provided to Bean demonstrate that the Primary Custodians include not only "top" managers, but several ranks of personnel. Moreover, the team approach FIA used for the Conversion and the survey Defendants conducted refute the notion that Primary Custodians do not possess substantially all responsive documents.

Moreover, the costs Defendants would incur to process, review and produce this duplicative data are substantial.  To collect data from a custodian for review, Defendants recover data from that employee's active Microsoft Outlook (including inbox, subfolders, sent items folder, deleted items folder), local hard drive and individually allotted server space.  Declaration of Jill C. Griset, attached as Ex. 17, ¶ 7.  Defendants then use search terms to identify potentially responsive documents.  *Id.* ¶ 8.  The resulting "hits" must then be loaded into a reviewing platform, reviewed by outside counsel for responsiveness and privilege, and a privilege log created.  *Id.* ¶¶ 9, 14, 15.

All told, the cost to Defendants to review and produce ESI held by just the 15 additional custodians identified by Bean will likely be at least $120,000, as set forth in the Griset Declaration.  *Id.* ¶ 17.  But Bean's requested relief is not limited to compelling Defendants to review and produce the ESI maintained by these individuals; rather, Bean seeks to compel Defendants to review and produce the ESI maintained by the "literally hundreds of individuals" who had any involvement with Bean or the Conversion.  Bean Mot. To Compel at 4-5.

When a party has already received discovery of the information it seeks, production of the same information from another source is unreasonably duplicative.  *See, e.g.*, *Miller v. Praxair, Inc.*, 2007 WL 1424316 at *3 (D. Conn. May 10, 2007) (denying motion to compel production of statistical information contained in documents already produced); *Rowe Entm't v. William Morris Agency, Inc.*, 205 F.R.D. 421, 430 (S.D.N.Y. 2002) (citing cases denying discovery where "equivalent information either [had] already been made available or [was] accessible in a different format at less expense").

Here, Defendants have produced substantially all responsive documents.  In view of the cost of producing additional custodians' ESI and the minimal benefit to Bean of doing so, "the burden or expense of the proposed discovery outweighs its likely benefit" and should be denied.

13

### b.  Bean Has Failed to Show Good Cause to Require Review of Additional ESI.

Fed. R. Civ. P. 26(b)(2)(B) requires Bean to show "good cause" to require the production of documents not reasonably accessible because of undue burden or cost.  Bean has failed to do so, offering no justification for its motion for protective order other than the possibility that Defendants might not produce all responsive documents.  But "[t]he mere possibility that a party might not produce all relevant, unprotected documents, is not a sufficient basis" for requiring a party to undertake unduly burdensome discovery.  *Lawyers Title Ins. Corp. v. U.S. Fidelity & Guaranty Co.*, 122 F.R.D. 567, 570 (N.D. Cal. 1988); *see also McCurdy Group, LLC v. Am. Biomedical Group, Inc.*, 9 Fed. Appx. 822, 831, 2001 WL 536974 at *7 (10th Cir. May 21, 2001) (defendant's skepticism that all relevant and non-privileged documents had been produced was not sufficient to warrant additional requested discovery).

Bean fails to acknowledge that Defendants have already produced more than 230,000 pages of documents obtained from the 21 Primary Custodians and 31 shared folders, and have collected and reviewed approximately 128 file boxes of hard copy documents.  Bean does not identify any specific category of document, by Request number, that Defendants have failed to produce.  Rather, Bean simply argues that it may not get every document if Defendants fail to search ESI for every employee that might have had the slightest involvement with Bean – an ironic position given Bean's refusal to agree to more than seven fact depositions per side.

As described above, relevant ESI regarding the Bean/FIA contract,[9] RFP submission, conversion and post-conversion performance was in the custody of the Primary Custodians and has been produced to Bean. Defendants have also created and provided documents to Bean that

---

[9] Although Bean disagrees, Defendants also contend that documents relating to the negotiation and drafting of the FIA-Bean contract in 1996 are discoverable.  Although Bean has refused to commit to producing its non-privileged documents from this time period in the possession of its counsel, Brann & Isaacson, FIA's documents from this period were maintained by one or more of the Primary Custodians (including its outside law firm) and/or stored in the shared folders, and in hard copy from employees and outside counsel and have been produced.

respond to Bean's document requests and interrogatories regarding the performance of the FIA portfolio after the Conversion date. This satisfies the requirements of Rules 26 and 34.

Bean's demands for additional ESI review and production are based on mistaken assumptions and speculation. First, Bean mischaracterizes the importance and the roles played by certain additional custodians. Bean identified 16 individuals from a post-conversion email produced by Defendants dated August 1, 2008, which attached an "LLBean Attrition Report" containing data relating to the number of FIA customers it retained post-Conversion. The email does not say that each **individual** recipient played an "important role" in the Conversion; but rather that their **teams** played important roles in "our efforts" – i.e. FIA's efforts to retain its customers post-Conversion. *See* Ex. 14. Defendants' survey demonstrates that all responsive documents were sent to and maintained by the Primary Custodians who actually executed those retention efforts, whose documents Defendants have reviewed and produced.

Bean's protests about Louis Ziccarelli's omission from the Primary Custodian list are equally unfounded. Had Bean asked why Mr. Ziccarelli was not a Primary Custodian before filing its Motion to Compel, Defendants would have explained that Mr. Ziccarelli's involvement post-dates the Conversion of the credit card. Affidavit of Louis Ziccarelli, attached as Ex. 18, ¶¶ 3, 5. Mr. Ziccarelli's ESI does not contain documents related to Bean during the 2007-2008 period leading up to the Conversion date. *Id.* ¶ 5. Only since December 16 has Mr. Ziccarelli been the primary FIA representative designated to assist Defendants' counsel in collecting documents and responding to Bean's discovery requests. Documents Mr. Zicarelli has obtained or prepared in this capacity have already been provided to counsel for production to Bean. *Id.* ¶¶ 6-7. Additional document production is not required given that Mr. Zicarelli was just assigned to his present role post-lawsuit. *See, e.g., Treppel v. Biovail Corp.*, 249 F.R.D. 111, 117 (S.D.N.Y. 2008) (denying discovery of ESI created after events giving rise to the litigation).

Had Bean's counsel initiated a meet-and-confer before filing Bean's motion, they would have learned about the survey Defendants' counsel conducted and learned why Mr. Zicarrelli was not a Primary Custodian.  The failure to do so is another ground for denial of Bean's motion.

**B.      Bean's Motion for Protective Order Should be Denied.**

Even as it seeks to force Defendants to undertake duplicative and costly discovery in response to its requests, Bean invites this Court to preclude Defendants from obtaining discovery pursuant to Rule 45 subpoenas properly issued from other districts.  Meanwhile, Bean is coordinating Barclays' and Auriemma's efforts to convince the courts that issued their respective subpoenas to delay ruling on Defendants' motions to compel production.  More delay will deny Defendants an opportunity to obtain the non-party documents in time to use them effectively during the remaining fact discovery period.  This Court should reject Bean's invitation.

**1.      The Issuing Courts Should Hear Any Objections to the Subpoenas.**

Bean's Motion for Protective Order seeks to circumvent the Federal Rules of Civil Procedure by asking this Court to assert jurisdiction over properly-issued subpoenas in four other District Courts.  It is well-settled that only the "issuing court" has the power to quash or modify a subpoena.  *See* Fed. R. Civ. P. 45(c)(3)(A), 1991 Advisory Committee Note; *In re Digital Equip. Corp.*, 949 F.2d 228, 231 (8th Cir. 1991) (court in which action was pending could not hear or decide objections to a subpoena for deposition, because court issuing subpoena had exclusive jurisdiction); *D.A.N. Joint Venture III, LP v. Coady*, 2008 U.S. Dist. LEXIS 19317 *1-2 (D. Conn. Mar. 13, 2008) ("Because the subpoenas which the movant seeks to quash were issued by other federal courts, this court has no jurisdiction to grant the movant's motion [to quash]").

*Hartz Mountain Corp. v. Chanelle Pharm. Veterinary Prods. Mfg. Ltd.*, 235 F.R.D. 535 (D. Me. 2006), provides no support for Bean's contention that this court should intervene in four other District Courts' management of subpoenas issued from those courts.  In *Hartz Mountain*,

one of the plaintiffs in a consolidated action moved to quash a subpoena issued in the District of Maine in contravention of a scheduling order previously issued by the presiding judge in the District of New Jersey.  235 F.R.D. at 535-36.  The court explained that "[w]hen a court from which a subpoena issued is not the forum in which the underlying action is pending, a motion to quash that subpoena is properly brought in the issuing court, as was done here." *Id.* at 536.  But the court concluded it should stay action on the motion to quash in order to permit the court that had issued the scheduling order to resolve the plaintiff's motion for protective order. *Id.*

Here, though, the extraordinary justification present in *Hartz Mountain* for intervention in a non-party subpoena by the court in which the action is pending – violation of a scheduling order – does not exist.  Defendants' subpoenas were properly issued pursuant to Rule 45.  Defendants have been able, in large part, to work out issues surrounding those non-parties' responses to the subpoenas.  Moreover, the subpoenaed parties are all represented by counsel who are fully capable of addressing any objections to the subpoenas to the respective issuing courts, where it is more convenient for those parties to raise their concerns.  There is no reason for this Court to step into the middle of these ongoing processes.

> ## 2. Bean Lacks Standing to Challenge the Subpoenas.

In addition, Bean lacks standing to challenge the subpoenas for burdensomeness, relevance, or overbreadth.  Indeed, it is well-settled that a party lacks standing to assert any rights of a non-party as a basis for challenging a subpoena.  *See, e.g.*, *Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 253 n.17 (D. Me. 2008) ("Ordinarily, a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought.") (quoting 9A Wright & Miller § 2459 at 435).

Bean selectively quotes from *Chamberlain v. Farmington Sav. Bank*, 2007 WL 2786421 (D. Conn. Sep. 25, 2007), and *Auto-Owners Ins. Co. v. Southeast Floating Docks, Inc.*, 231 F.R.D. 426 (M.D. Fla. 2005), to suggest that it has standing to challenge Defendants' subpoenas on grounds other than the protection of its own rights or privileges.  But both cases merely recognized the settled rule that a party does not have standing to challenge a subpoena served on a non-party, unless the party can assert a "personal right or privilege" with respect to the documents sought.  *Chamberlain*, 2007 WL 2786421 at *1; *Auto-Owners*, 231 F.R.D. at 429.[10]

### 3.    Bean Has Failed to Demonstrate Its Entitlement to a Protective Order.

The only rights Bean may assert in objecting to Defendant's non-party subpoenas are its own.  *Arista Records*, 584 F. Supp. 2d at 253 n.17.  Here, Bean asserts that "every one of the non-parties has confidential information of Bean" and asks the Court to "strictly limit" the scope of Defendants' subpoenas in order to prevent the **possible** improper disclosure of such information.   Bean's unsupported assertions are entirely inadequate.  A party seeking a protective order must demonstrate particular and specific facts to establish "good cause" for the order.  *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir. 1986).  Mere conclusory allegations of harm are insufficient.  *See, e.g.*, *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) (generalized allegation of injury to relationship with clients insufficient to support protective order); *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985) (burden is not met by conclusory recitation of expense and burdensomeness).

Bean has failed to carry its burden.  Bean has not shown why its confidentiality concerns are not fully addressed by the Stipulated Confidentiality Order.  *See In re Subpoena Duces Tecum Served on Bell Communications Research, Inc.*, 1997 WL 10919, *10 (S.D.N.Y. Jan. 13,

---

[10] It is irrelevant that Bean couches its motion as one for protective order, rather than a motion to quash, as it seeks essentially the same result. *See, e.g.*, *Mannington Mills, Inc. v. Armstrong World Indus.*, 206 F.R.D. 525, 529 (D. Del. 2002) (motion to quash is, in essence, same as a party's motion for protective order).

1997) (holding that a valid protective order in the underlying litigation adequately protects parties and non-parties who have confidentiality concerns and "to hold otherwise would impede the truth-seeking function of discovery in federal litigation").  It makes only general claims.  Likewise, Bean has failed to articulate the scope of any non-disclosure agreements that may be relevant or explain how the Stipulated Confidentiality Order already entered by this Court – which specifically provides that non-parties responding to Rule 45 subpoenas may designate documents produced as either "Confidential" or "Highly Confidential – Access Restricted" – is inadequate to deal with any inadvertent disclosure that may occur.

Because Bean has articulated no "particular and specific facts" establishing good cause, there is no reason for this Court to step in to shut down Rule 45 discovery ongoing in other districts.  If Bean believes that the Stipulated Confidentiality Order to which it earlier agreed is inadequate to protect its confidential information, the proper course is for it to address those concerns to the respective issuing courts, which have jurisdiction over the non-parties and can best assess whether any additional protections are required.  *See, e.g.*, *In re Digital Equip. Corp.*, 949 F.2d at 231; *D.A.N. Joint Venture III*, 2008 U.S. Dist. LEXIS 19317 at *1-2.

### 4.    The Subpoenas Seek Documents Not Discoverable From Bean.

Under Fed. R. Civ. P. 26, parties may conduct discovery regarding any matter relevant to the subject matter of the litigation or which is reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26(b)(1).  The term "relevant" is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that bears on, any issue that is or may be in the case."  *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L.Ed.2d 253 (1978).  It is well-settled that the scope of discovery permitted under a Rule 45 subpoena is the same as that permitted under Rule 26.  *See, e.g.*, Fed. R. Civ. P. 45 Advisory Committee Notes to 1970 Amendment; *see also* 9A Wright & Miller 2459 at 42

(scope of discovery through a subpoena is "exceedingly broad" and incorporates the provisions of Rules 26(b) and 34); *see also Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, 2001 U.S. Dist. LEXIS 15638, *8 (S.D.N.Y. Oct. 4, 2001) (holding "the theoretical availability of information from another source is not a reason, in itself, to preclude non-party discovery").

Documents in the possession of Barclays, Auriemma, Acxiom, and RSG plainly meet this standard. Barclays succeeded FIA as Bean's co-branded credit card issuer, and possesses documents relevant to its agreement with Bean and to the performance of its credit card portfolio after the Conversion. Auriemma possesses documents relevant to Bean's search for a new co-branded partner. Acxiom and RSG each possess documents related to the services they provided for Bean. Bean's motion to for protective order implies that each of these parties will likely have the same documents, and that their documents will likely be identical to those Bean is producing, but sets out no basis for such a determination. Each of the non-parties served different functions for Bean and there is no reason to believe that they shared Bean-related documents with each other. Each also likely has internal Bean-related documents that were not shared with Bean. Discovery of these documents is necessary for Defendants to develop their claims and defenses.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court:

1.      Deny Bean's Motion to Compel, and grant Defendants' Motion for Protective Order objecting to review and production of responsive documents beyond those of the Primary Custodians;

2.      Deny Bean's Motion for Protective Order regarding Defendant's ongoing efforts to obtain relevant documents from non-parties under Rule 45.

This, the 7th day of April, 2009.

/s/ Bradley R. Kutrow_____
Bradley R. Kutrow (admitted *pro hac vice*)
Grant D. Goldenberg (admitted *pro hac vice*)
Angela H. Zimmern (admitted *pro hac vice*)
McGuireWoods LLP
100 North Tryon St, Suite 2900
Charlotte, NC 28202
(704) 343-2000, phone
(704) 373-8935, fax
bkutrow@mcguirewoods.com
ggoldenberg@mcguirwoods.com
azimmern@mcguirewoods.com


S. Elaine McChesney
Bingham McCutcheon, LLP
1 Federal Street
Boston, Massachusetts 02110
(617) 951-8000, phone
(617) 951-8736, fax
elaine.mcchesney@bingham.com

Corin R. Swift
Bingham McCutcheon, LLP
85 Exchange, Suite 300
Portland, Maine 04101
(207) 780-8276, phone
(207) 780-8286, fax
corin.swift@bingham.com

*Attorneys for Bank of America Corp. and FIA Card Services, N.A.*

## CERTIFICATE OF SERVICE

I, Bradley R. Kutrow, hereby certify that the foregoing Defendants' Opposition to Plaintiff's Motion to Compel Defendants to Review and Produce Documents and for Protective Order as to Third-Party Subpoenas and Defendants' Motion for Protective Order with Incorporated Memorandum of Law was served pursuant to the CM/ECF system upon:

> George S. Isaacson
> Matthew P. Schaefer
> Brann & Isaacson
> 184 Main Street
> P.O. Box 3070
> Lewiston, Maine 04243-3070
> (207) 786-3566, phone
> (207) 783-9325, fax
> gisaacson@brannlaw.com
> mschaefer@brannlaw.com
>
> *Attorneys for L.L. Bean, Inc.*

This the 7th day of April, 2009.

> /s/ Bradley R. Kutrow
> Bradley R. Kutrow